**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JEAN-CLAUDE FRANCHITTI,

Plaintiff,

v.

COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION and COGNIZANT TECHNOLOGY SOLUTIONS U.S. CORPORATION,

Defendants.

Civil Action No. 1:21-cv-02174-JMF

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

I. BACKGROUND .......... 1

A. Statement of Facts. .......... 1

B. Procedural History. .......... 5

II. LEGAL STANDARD .......... 6

III. ARGUMENT .......... 7

A. Judgment as a Matter of Law Based on Lack of Causation is Not Warranted. .......... 7

B. Cognizant's Motion For a New Trial Should Be Denied. .......... 13

*1. There was Sufficient Evidence of Protected Activity and Knowledge. .......... 13*

*2. The Court's Evidentiary Rulings Do Not Warrant a New Trial. .......... 17*

C. The Jury's Award of Backpay Should Stand. .......... 19

*1. The Jury Correctly Rejected Cognizant's Mitigation Affirmative Defense. .......... 19*

*2. Franchitti's Awarded Damages Were Not Based on Guesswork. .......... 22*

D. The Court Should Uphold the Jury's Award of Punitive Damages. .......... 23

*1. The Court Should Not Grant Judgment as a Matter of Law or Order a New Trial. .......... 23*

*2. The Court Should Not Grant a Remittitur Based on Due Process. .......... 26*

IV. CONCLUSION .......... 28

# TABLE OF AUTHORITIES

**Cases**

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36 (2d Cir. 2012) ............ 17

*Applestein v. Kleinhendler*, 2025 U.S. Dist. LEXIS 63397 (E.D.N.Y. Apr. 2, 2025) ............ 27

*Ashok v. Barnhart*, 289 F.Supp.2d 305 (E.D.N.Y. 2003) ............ 8

*Bailey v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2023 U.S. Dist. LEXIS 218589 (N.D.N.Y. Dec. 8, 2023) ............ 22

*Banks v. GM, LLC*, 81 F.4th 242 (2d Cir. 2023) ............ 7, 8

*Broadnax v. City of New Haven*, 415 F.3d 265 (2d Cir. 2005) ............ 19, 20

*Cash v. Cnty. of Erie*, 654 F.3d 324 (2d Cir. 2011) ............ 6

*Champagne v. Columbia Dental, P.C.*, 2022 U.S. Dist. LEXIS 9190 (D. Conn. Jan. 19, 2022) . 24

*Clarke v. Frank*, 960 F.2d 1146 (2d Cir.1992) ............ 19

*Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241 (2d Cir. 2005) ............ 6

*Depascale v. Sylvania Elec. Prods.*, 510 F. App'x 77 (2d Cir. 2013) ............ 14

*Depascale v. Sylvania Elec. Prods.*, 710 F.Supp.2d 275 (E.D.N.Y. 2010) ............ 14

*Duplan v. City of N.Y.*, 888 F.3d 612 (2d Cir. 2018) ............ 9

*Earl v. Bouchard Transp. Co.*, 917 F.2d 1320 (2d Cir. 1990) ............ 7

*Edelman v. NYU Langone Health Sys.*, 141 F.4th 28 (2d Cir. 2025) ............ passim

*EEOC v. Ethan Allen, Inc.*, 44 F.3d 116 (2d Cir. 1994) ............ 10, 11

*EEOC v. Joint Apprenticeship Comm.*, 186 F.3d 110 (2d Cir. 1998) ............ 22

*EEOC v. Kallir, Philips, Ross, Inc.*, 420 F.Supp.919 (S.D.N.Y. 1976) ............ 21

*Elyse v. Bridgeside Inc.*, 367 F. App'x 266 (2d Cir. 2010) ............ 6

*Fairbrother v. Morrison*, 412 F.3d 39 (2d Cir. 2005) ............ 6

*Finn-Verburg v. N.Y. State DOL*, 165 F.Supp.2d 223 (N.D.N.Y. 2001) ............ 14

*Fraser v. Wyeth, Inc.*, 992 F.Supp.2d 68 (D. Conn. 2014) ............ 25

*Greenbaum v. Svenska Handelsbanken*, 67 F.Supp.2d 228 (S.D.N.Y. 1999) (Sotomayor, J.) ........ passim

*Guerrero v. Constellation Health Servs., LLC*, 2026 U.S. Dist. LEXIS 87783 (E.D.N.Y. Apr. 21, 2026)........ 28

*Gutierrez v. Taxi Club Mgmt.*, 2018 U.S. Dist. LEXIS 106808 (E.D.N.Y. June 25, 2018)......... 28

*Habeeb Ahmad v. N.Y. Univ.*, 2025 U.S. Dist. LEXIS 213605 (S.D.N.Y. Oct. 29, 2025)..... 20, 21

*Hicks v. Encarnacion*, 2026 U.S. Dist. LEXIS 66736 (S.D.N.Y. Mar. 27, 2026)........ 7

*ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92 (2d Cir. 2014)........ 13

*Kia Song Tang v. Glocap Search LLC*, 2015 U.S. Dist. LEXIS 123764 (S.D.N.Y. Sep. 16, 2015) (Furman, J.) ........ 6, 13, 14

*Koyen v. Consol. Edison Co.*, 560 F.Supp. 1161 (S.D.N.Y. 1983) ........ 23

*Kuper v. Empire Blue Cross & Blue Shield*, 2003 U.S. Dist. LEXIS 2362 (S.D.N.Y. Feb. 11, 2003)........ passim

*Kwan v. Andalex Grp., LLC*, 737 F.3d 834 (2d Cir. 2013)........ 8, 10

*Lewis v. Am. Sugar Refin., Inc.*, 325 F.Supp.3d 321 (S.D.N.Y. 2018)........ 26

*Lopez v. Aramark Unif. & Career Apparel, Inc.*, 426 F.Supp.2d 914 (N.D. Iowa 2006)........ 15

*MacMillan v. Millenium Broadway Hotel*, 873 F.Supp.2d 546 (S.D.N.Y. 2012)........ 28

*Metromedia Co. v. Fugazy*, 983 F.2d 350 (2d Cir. 1992)........ 7

*Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218 (2d Cir. 2024)........ 8

*Nasser Saber v. N.Y. State Dep't of Fin. Servs.*, 2018 U.S. Dist. LEXIS 121811 (S.D.N.Y. July 20, 2018)........ 9

*Perry v. City of N.Y.*, 552 F.Supp.3d 433 (S.D.N.Y. 2021)........ 16

*Philip Morris USA v. Williams*, 549 U.S. 346 (2007)........ 25

*Pierce v. City of N.Y.*, 805 F. App'x 70 (2d Cir. 2020) ........ 13

*Qorrolli v. Metro. Dental Assocs., D.D.S.*, 2022 U.S. Dist. LEXIS 226228 (S.D.N.Y. Dec. 15, 2022........ 25, 26

*Ramey v. Dist. 141, Int'l Assoc. of Machinists & Aerospace Workers*, 2010 U.S. Dist. LEXIS 94646 (E.D.N.Y. Sept. 10, 2010)........ 20, 21

*Rowe v. Google LLC*, 2026 U.S. Dist. LEXIS 73890 (S.D.N.Y. Apr. 3, 2026) .......................... 28

*Schara v. Tlic Worldwide, Inc.*, 2023 U.S. Dist. LEXIS 25754 (D.R.I. Feb. 13, 2023)............... 23

*Spencer v. Int'l Shoppes, Inc.*, 2013 U.S. Dist. LEXIS 25524 (E.D.N.Y. Feb. 25, 2013)........... 19

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ............................................ 26

*Summa v. Hofstra Univ.*, 708 F.3d 115 (2d Cir. 2013) ............................................................... 13

*Thomas v. iStar Fin., Inc.*, 508 F.Supp.2d 252 (S.D.N.Y. 2007) (over 3:1)................................ 28

*Timbie v. Eli Lilly & Co.*, 2010 U.S. Dist. LEXIS 143434 (D. Conn. July 14, 2010)................. 13

*Tolbert v. Queens Coll.*, 242 F.3d 58 (2d Cir. 2001) .......................................................... 6, 9, 24

*Tse v. UBS Fin. Servs., Inc.*, 568 F.Supp.2d 274 (S.D.N.Y. 2008).............................................. 25

*Turner v. Delta Airlines, Inc.*, 658 F.Supp.3d 123 (E.D.N.Y. 2023)........................................... 11

*United States v. English*, 521 F.2d 63 (9th Cir. 1975) ................................................................ 23

*Valentia Villetti, Faiza Jibril, M.D. v. Guidepoint Global LLC*, 2022 U.S. App. LEXIS 18651 (2d Cir. July 7, 2022) ........................................................................................................ 12

*Vasquez v. N.Y.C. Dep't of Educ.*, 2015 U.S. Dist. LEXIS 75321 (S.D.N.Y. June 10, 2015) 25, 26

*Watson v. E.S. Sutton, Inc.*, 2005 U.S. Dist. LEXIS 31578 (S.D.N.Y. Sep. 6, 2005) .................. 25

*Whittlesey v. Union Carbide Corp.*, 742 F.2d 724 (2d Cir. 1984)............................................... 23

*Wong v. Mangone*, 450 F. App'x 27 (2d Cir. 2011) ..................................................................... 13

*Xu-Shen Zhou v. State Univ. of N.Y. Inst. of Tech.*, 4 F.Supp.3d 404 (N.D.N.Y. 2014)............... 12

**Rules**

Fed. R. Civ. P. 50 ................................................................................................................ 6, 7

Fed. R. Civ. P. 59 ............................................................................................................ 6, 13, 17

Fed. R. Evid. 403 ........................................................................................................................ 19

Fed. R. Evid. 608 ........................................................................................................................ 19

Fed. R. Evid. 613 ........................................................................................................................ 19

Cognizant's post-verdict motion for judgment as a matter of law and for a new trial or remittitur should be denied for the reasons set forth herein.

## I. BACKGROUND

### A. Statement of Facts.

Plaintiff Franchitti joined Cognizant in April 2007 as a Director and Chief Architect. Tr. 62:17-63:2. In 2011, he was promoted to Assistant Vice President ("AVP") and thereafter joined Cognizant's Global Technology Office ("GTO") where he ran the Global Technology Consulting ("GTC") group and reported to Raj Bala (Chief Technology Officer). *Id.* 63:20-22; 64-6-20, 67:6-8, 68:6-14. Towards the middle of 2014, GTO became part of Cognizant Business Consulting ("CBC"). *Id.* 66:19-25, 68:22-25. Franchitti ran CBC-GTO, which was essentially GTC but "relabeled," and reported to both Bala and Mark Livingston (Head of CBC and Executive Vice President ("EVP")). *Id.* 67:4-16, 68:4-7, 69:1-4. In both roles, Franchitti's job was to "identify projects with customers," "help customers with strategy," including "projects," and "provid[e] resources to fill in these projects." *Id.* 67:5-6, 18-22.

Franchitti's clients thought that he performed his role exceptionally well, asserting in 2015 that Franchitti "walk[ed] on water," that others could not "hold a candle" to him, and praising him as "collaborative," "polite," and able to build "strong relationships." PX-70. For most of his career, Cognizant agreed. In 2014, Franchitti received performance ratings of "Exceeds Most Expectations," the second highest rating. PX-79 at 8. Based on this stellar record, Bala nominated Franchitti for a promotion at the beginning of 2015. Tr. 410:10-12.

Beginning in 2013, Franchitti was asked to help effectuate Cognizant's "visa readiness strategy" by signing manager letters to get associates in India equipped with visas so that they could quickly travel to the U.S. when "suitable opportunit[ies]" "ar[o]se[]." PX-30; Tr. 84:10-18, 90:17-19. Cognizant (including Bala and Livingston) encouraged the use of visa workers because

they were "less expensive" and using them instead of "American employees" helped "increase the margins." Tr. 85:6-86:5, 87:19-21, 94:3-17, 101:15-20. While reliance on visa workers had always been part of Cognizant's business model, efforts ramped up in 2014 and 2015, as margins became a critical focus area. Tr. 101:21-102:3, 403:19-21, 404:14-17, 579:22-580:5. Visa workers were, as Livingston put it, a "lever[]" to "crank[] up [m]argins." JX-2; Tr. 585:2-6. As Franchitti saw his American team members being replaced on projects by Indian visa workers and encountered more and more difficulties placing U.S. workers on projects, he realized that the letters were being used to discriminate based on race and national origin. Tr. 85:6-23, 101:21-102:3, 180:5-10, 225:25-226:3.

Bala, for his part, also harbored a prejudice against non-Indian technology workers, referring to Indians as "superior" throughout 2014 and, beginning in December 2014, increasingly made targeted comments about getting rid of "heavyweights," or westerners, and replacing them with Indian visa employees. Tr. 102:11-103:14, 105:14-19; *see also* PX-28. At the same time, Bala sought to protect Indian employees from the bench, including instructing that Aftab Chopra and other Indian employees with low utilization be "quietly move[d]" or "park[ed]" in GTO rather than sent to the bench in late-2015. *See, e.g.*, PX-32; DX-31; Tr. 124:2-11.

Franchitti reasonably and in good faith believed that these practices and Bala's comments constituted race and national origin discrimination. JX-39. As Livingston and Bala acknowledged, Franchitti was not one to keep his concerns to himself, Tr. 472:6-19, 592:12-13, 595:12-15, 596:7-9, DX-38, and he did not.

Beginning in 2014, Franchitti told Bala that he "disagreed" with Bala's comments about non-Indians and that such comments were "illegal in America." Tr. 103:15-25. Later, he protested more vocally, telling Bala that his efforts to protect Indian employees while instructing Franchitti

to "offload heavyweights" (including in December 2015) were "pure discrimination." *Id*. 109:2-8. In early 2015, Franchitti also raised concerns with Bala about discrimination in connection with the manager letters. *Id*. 109:12-20, 227:10-13; PX-29.

After he raised concerns about manager letters, Franchitti's relationship with Bala became "unsustainable … very quickly." Tr. 110:1-4. Prior to complaining, Franchitti never had a travel budget imposed on him, and Bala—to whom Franchitti had reported since 2011—had never rejected an expense report. *Id*. 68:11-14, 110:1-111:2. But in early 2015, Bala suddenly "started nitpicking the reports and refusing to pay them." *Id*. 112:6-8. Bala also started "undercutting" CBC-GTO, taking Franchitti's customers to a unit Bala had formed called GTO Labs, and making it "difficult" for Franchitti to "sustain [his] numbers." *Id*. 112:25-113:5.

When it came time to provide feedback for Franchitti's promotion, Bala's comments were tepid, in sharp contrast to the glowing feedback from clients, PX-70 at 6-7, and Franchitti was not promoted.

In mid-2015, Franchitti raised concerns with Livingston about: Bala's comments, Bala's actions that impeded Franchitti's success, and Cognizant's discriminatory business model. Tr. 113:16-114:10. After that, Livingston "stopped meeting with [Franchitti] on a regular basis," and "ma[de] negative remarks more than positive ones, trying to blame [Franchitti] for one thing or another." *Id*. 115:6-13. Soon thereafter, in November 2015, Livingston suggested eliminating Franchitti's position, ostensibly to help finance the salary of a prospective hire, Seth Siegel. DX-24. However, the hiring was put on hold on December 14. PX-14.

In 2016, Franchitti continued complaining to Bala about discrimination, including "several times" in February 2016. Tr. 151:7-13. Their relationship grew more tense. On April 1, 2016, Bala directed Franchitti to nominate Alan Inglis for a promotion. JX-7. Inglis was a manager who

reported to Franchitti and managed the U.K. group for CBC-GTO. 151:17-20. Franchitti calmly expressed concern about defending the nomination as Inglis did not meet the promotion criteria, asking Bala to speak in case Franchitti was "missing something of substance." JX-7.

Also on April 1, Bala sent an email around that referred to "motivating younger talent ... to take up higher responsibilities." PX-3. Franchitti wrote to Bala separately the following day to tell him that members of the team had "expressed concerns about the terminology," and asked to discuss that part "offline." *Id.*; *see also* PX-8.

On April 3, 4, and 5, 2016, Franchitti raised concerns, including about American employees being replaced by Indians, escalating his complaints to Paul Van Buhler and Neil Neveras in CBC HR and Allen Shaheen, an EVP. Tr. 155:17-156:4; 157:11-158:23, 160:2-18, PX-4, 5, 7, 8. Franchitti reported both "race and related age discrimination," PX-25, because he viewed age and race discrimination as "intertwined" where Cognizant was "bringing younger Indians to replace ... the more skilled people on his team." Tr. 170:21-171:1.

Cognizant's practices did not change in response to these complaints, *id.* 158:21-23, 160:19-21, but Franchitti found himself on an accelerated path to termination. The next month was difficult for Franchitti. His concerns about the Ingles promotion prompted an outsized reaction and "somehow escalated into a long discussion." PX-71. On May 4, Bala emailed Livingston about "[t]he pain JC [wa]s causing," asserting that "US revenue on CBC [had] not increased." DX-38. Livingston looped in Neveras, and Neveras jumped into gear, seeking KRAs and "documentation of [Franchitti] missing targets." *Id.*; PX-76.

On June 27, Neveras informed Legal that Cognizant "need[ed] to terminate [Franchitti] for poor performance," that he was "gathering" the "[g]rounds," and that Franchitti "ha[d] been underperforming for about two years, and [they] ha[d] good documentation as such." PX-47.

There was one hitch: CBC-GTO's revenue *had* increased, and by June 2016, it was performing well across the board compared to the other GTO sub-units. PX-57 at 6. CBC-GTO was the only one of the seven sub-units that met or exceeded targets for revenue, customer profit, and PP for the month of June in 2016, and was one of only two sub-units that exceeded PP targets for the year to date. *Id*. CBC-GTO was behind target in only two categories: revenue and customer profit for the year to date, but so were the vast majority of the other sub-units, and CBC-GTO was only $100,000 behind the revenue target, a miniscule amount compared to other sub-units. *Id*.; Tr. 127:10-128:14.

Bala was apparently aware of this, and relayed to Neveras on a June 28 phone call (summarized the following day in an email) that Franchitti's "last three months of data ha[d] been very much in line with [their] expectations and hence not leading to a recent performance." JX-3. While Neveras flagged this "nuance[]," PX-47, the organization went ahead with Franchitti's termination on July 19, 2026. Tr. 165:23-25.

**B. <u>Procedural History.</u>**

This trial proceeded on claims for termination-based retaliation in violation of Title VII and the New York State Human Rights Law ("NYSHRL"). Dkt. 70 at 20. Trial commenced on March 23, 2026, and lasted five days. Dkt. 182.

At the close of Franchitti's case, Cognizant moved under Rule 50(a) for judgment as a matter of law, arguing that: Franchitti's testimony that "he made a complaint" was "patently incredible"; Franchitti did not show causation; and Franchitti did not mitigate damages. Tr. 777:14-780:11. The Court rejected all three arguments. *Id.* 777:6-780:14.

On March 30, 2026, the jury reached a unanimous verdict, finding for Franchitti on both claims and awarding him $4.2 million in compensatory damages (back pay) and $4.2 million in

punitive damages, for a total award of $8.4 million. Dkt. 207 at 11-13. Judgment was entered on April 1, 2026. Dkt. 208.

## II. LEGAL STANDARD

Rule 50 "imposes a heavy burden on a movant," particularly where "'the jury has deliberated in the case and actually returned its verdict' in favor of the non-movant." *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)). "In such circumstances, a court may set aside the verdict only if, viewing the evidence in the light most favorable to the non-movant, 'there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it.'" *Kia Song Tang v. Glocap Search LLC*, 2015 U.S. Dist. LEXIS 123764, at *2 (S.D.N.Y. Sep. 16, 2015) (Furman, J.) (quoting *Cash*, 654 F.3d at 333).

"'The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.'" *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (quotation omitted). The motion must be considered "'with credibility assessments made *against* the moving party,'" *Fairbrother v. Morrison*, 412 F.3d 39, 50 (2d Cir. 2005) (quotation omitted), and the court must disregard all evidence favorable to the moving party that the jury is not required to believe. *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 44 (2d Cir. 2025).

A new trial under Rule 59(a) can be granted based on the "weight of the evidence only if [the court] determines that the jury's verdict was 'seriously erroneous,' ... or 'a miscarriage of justice.'" *Elyse v. Bridgeside Inc.*, 367 F. App'x 266, 268 (2d Cir. 2010) (quotations omitted). "In making its determination, however, the court must refrain from invading the province of the jury

to evaluate the credibility of the witnesses." *Id*. "Where the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992).

A court may grant a new trial because of "'substantial errors in the admission or exclusion of evidence, [or] prejudicial misconduct from counsel,'" but only if "'each of those errors or instances of misconduct[ were] clearly prejudicial to the outcome of the trial, considered in light of the record as a whole.'" *Hicks v. Encarnacion*, 2026 U.S. Dist. LEXIS 66736, at *6 (S.D.N.Y. Mar. 27, 2026) (quotation omitted).

"Remittitur is the 'process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial.'" *Kuper v. Empire Blue Cross & Blue Shield*, 2003 U.S. Dist. LEXIS 2362, at *5 (S.D.N.Y. Feb. 11, 2003) (quoting *Earl v. Bouchard Transp. Co*., 917 F.2d 1320, 1328 (2d Cir. 1990)). An award is excessive if it "shocks the judicial conscience," in which case a court "should remit the jury's award to the maximum amount that would not be excessive." *Id*. at 5-6.

## III. ARGUMENT

### A. Judgment as a Matter of Law Based on Lack of Causation is Not Warranted.

Cognizant's motion for judgment as a matter of law based on lack of causation is without merit. On a Rule 50 motion, retaliation claims are evaluated under the *McDonnell Douglas* burden-shifting framework, under which the plaintiff must first establish a *prima facie* case (including a causal connection between the protected activity and adverse action), the defendant must then offer legitimate reasons for its actions, after which, the burden then shifts back to the plaintiff to show pretext. *Edelman*, 141 F.4th at 45; *Banks v. GM, LLC*, 81 F.4th 242, 270 (2d Cir. 2023). The plaintiff must prove that "retaliation was a 'but-for' cause of the adverse action," but this does "not require proof that retaliation was the only cause of the employer's action, but only that the adverse

action would not have occurred in the absence of the retaliatory motive." *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845-46 (2d Cir. 2013).

At trial, Franchitti presented sufficient evidence "'indirectly establish[ing] a causal connection to support [his] retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action.'" *Edelman*, 141 F.4th at 49-50 (quoting *Banks*, 81 F.4th at 277). Franchitti testified that he complained about race and national origin discrimination on April 4 and 5, 2016, including to Neveras (CBC HR to whom Franchitti escalated his complaints). *See* §I.A., *supra*. Within a month, the wheels were in motion: Neveras was gathering "documentation" to justify a performance-based rationale, culminating in Franchitti's termination in July 2016. *Id*. This timing supports an inference of retaliatory intent. *See Edelman*, 141 F.4th at 50, 51 (inference of retaliatory intent where defendant began "collecting information with an eye toward ensuring that [plaintiff's] contract would not be renewed" shortly after plaintiff followed up about complaints); *Ashok v. Barnhart*, 289 F.Supp.2d 305, 315 (E.D.N.Y. 2003) (temporal proximity based on two-month interval between protected activity and adverse action satisfied plaintiff's *prima facie* showing).

The jury could also have found, "[b]ased on the record as a whole," that Franchitti's termination was the "culminat[ion]" of a "years-long campaign of retaliation" that began in early 2015. *See Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 255 (2d Cir. 2024). The jury heard and saw evidence that after Franchitti complained of discrimination, Bala began nitpicking and refusing to approve Franchitti's business expense reports, opposed Franchitti's promotion (after having nominated him), and undercut Franchitti's business unit. *See* §I.A., *supra*. Further, shortly after Franchitti complained to Livingston in 2015, Livingston's attitude shifted, and in November 2015, Livingston suggested eliminating Franchitti's position. *Id*. In 2016, after Franchitti escalated

his complaints to HR and others, Bala had an outsized reaction when Franchitti pushed back on nominating a poor performer for a promotion, Bala and Livingston recommended Franchitti's termination, Neveras began gathering the grounds, and Franchitti was fired. *Id*. This sequence of events, together, shows a "drumbeat of retaliatory animus." *Duplan v. City of N.Y.*, 888 F.3d 612, 626 (2d Cir. 2018) ("drumbeat of retaliatory animus" where following complaint, plaintiff was ostracized, given insufficient work, and denied a promotion and raise).

Cognizant argues that Franchitti was not treated worse after complaining, but that argument fails where, as here, the Court is required to draw credibility assessments "against the moving party." *Fairbrother*, 412 F.3d at 50. At trial, the jury was entitled to reject Bala's testimony that he scrutinized expenses uniformly in connection with margin optimization, Mem. at 8 (Dkt. 218) (citing Tr. 491:12-492:3) and to instead find that Franchitti's complaints prompted increased scrutiny. *See Nasser Saber v. N.Y. State Dep't of Fin. Servs*., 2018 U.S. Dist. LEXIS 121811, at *26 (S.D.N.Y. July 20, 2018) (upholding verdict where "jury inferred" that negative evaluation following complaint "was a result of" the complaint rather than because a new supervisor was simply appraising work "according to his or her own expectations"). Cognizant also suggests that the Court should credit Bala's claim that Franchitti's complaints did not involve race discrimination as "uncontradicted and unimpeached," Mem. at 8, but Bala's testimony is contradicted by Franchitti's testimony, and regardless, "uncontradicted and unimpeached" evidence should be credited only if "that evidence comes from disinterested witnesses," which Bala is not given his role in the events at issue. *See Tolbert*, 242 F.3d at 70, 72.[1]

[1] Cognizant argues that "positive action[s]" break the chain of causation, Mem. at 8, but Bala's promotion nomination predated most of Franchitti's complaints, *see* §I.A., *supra*, Bala testified that moving Franchitti to the bench would actually have guaranteed his termination, Tr. 464:12-16, and the jury was not required to accept Bala's claim that he "protected Franchitti," which, in any event, would have predated Franchitti escalating his complaints to HR.

While Cognizant argues that it has presented "[o]verwhelming [e]vidence" of "legitimate, non-retaliatory reasons" for Franchitti's termination, namely: "restructuring," Franchitti's "conduct" towards his colleagues, and poor performance, Mem. at 6-7, the jury could have rejected each or found "weaknesses, implausibilities, inconsistencies, or contradictions" among its various justifications sufficient to demonstrate that "retaliation was a but-for cause" and "the explanations were a pretext for a prohibited reason." *Kwan, LLC*, 737 F.3d at 846 (proximity plus inconsistencies sufficient for but-for causation).

Cognizant's "restructuring" justification fails on its face because Cognizant cannot and does not actually claim that Franchitti was terminated *because of* restructuring where Bala testified that plans to replace Franchitti were "taken sooner" because of the "pain that [Franchitti] was causing." Tr. 468:24-469:6. In addition, the jury could have found that Livingston's initial proposal to eliminate Franchitti's position was spurred by Franchitti reporting discrimination and was therefore itself retaliatory. *Edelman*, 141 F.4th at 52 (no need to "proceed to the third step of the *McDonnell Douglas* framework" where proffered legitimate, nondiscriminatory reasons were "infected by the retaliatory motives"). The jury could also have found pretext from fact that an "interim leadership plan" was necessary following Franchitti's termination, that the "restructuring" justification was not relayed to Franchitti, and Cognizant's own contemporaneous efforts to "justify" the termination were based on performance (not restructuring). JX-11; PX-47; Tr. 166:24-167:2; *see EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 118 (2d Cir. 1994) ("inconsistent explanations" allow jury to find pretext). Cognizant's cases in which terminations pursuant to RIFs were found non-retaliatory involved terminations that actually took place pursuant to RIFs (unlike here) and a lack of pretext. *See* Mem. at 7 (citing *Quarless*, *Singer*).

Likewise, the jury could reasonably have found Cognizant's claim that Franchitti was terminated for his "conduct" towards his colleagues or "insubordination" to be "infected by the retaliatory motives." *Edelman*, 141 F.4th at 52. Bala acknowledged that his relationship with Franchitti soured in 2015, but maintained that it soured because Franchitti, after almost a decade at the company, suddenly changed from being "collaborative," "polite," and able to build "strong relationships," PX-70, to being "chronically argumentative." Tr. 439:15-19. It was reasonable for the jury to reject that claim and find that Franchitti's relationships with Bala, Livingston, and Neveras soured *because* he reported discrimination and that the "pain [he] was causing," DX-38, stemmed from his discrimination complaints. The jury could also have found pretext where Cognizant sought to create a paper trial justifying Franchitti's termination based on "missing targets," PX-76, and not insubordination. *See Ethan Allen*, 44 F.3d at 118.

The jury could similarly have found that Cognizant's "performance" justification was "infected by the retaliatory motives," *Edelman*, 141 F.4th at 52, as Bala sought to sabotage Franchitti's performance by usurping his business after he complained. *See* §I.A., *supra*. The jury could also have found it implausible that Cognizant would have terminated Franchitti for financial performance, when even Cognizant's witnesses admitted that Franchitti's financial performance was good *at the time of his termination* (a fact also confirmed by documentary evidence). JX-3; Tr. 644:14-16.[2] Cognizant argues that it is not the Court's job to "'assess[] the merits—or even the rationality—of employers' nondiscriminatory business decisions.'" Mem. at 10-11 (quoting *Turner v. Delta Airlines, Inc.*, 658 F.Supp.3d 123, 132 (E.D.N.Y. 2023)). But it was the jury's job to assess whether Cognizant's claim that it made a nondiscriminatory business decision was

[2] Cognizant claims that the termination decision had been made by the time Franchitti's performance improved, Mem. at 10, but Cognizant was aware of Franchitti's improved performance at the time it was seeking to "justify" his termination based on performance. JX-3.

plausible and credible, and the jury decided that it was not. *See Xu-Shen Zhou v. State Univ. of N.Y. Inst. of Tech.*, 4 F.Supp.3d 404, 418-19 (N.D.N.Y. 2014) ("jury was entitled to infer" based on other evidence and its own credibility assessments that "proffered legitimate, non-retaliatory reason[s] w[ere] false or unworthy of credence"), vacated on other grounds, 592 F. App'x 41 (2d Cir. 2015).

Cognizant claims that financial performance was just a small aspect of overall performance, and that Franchitti was terminated due to "non-financial performance," including: personal utilization, expense report issues, and "failing to fully implement CBC programs." Mem. at 3. But it was reasonable for the jury to find these justifications pretextual where contemporaneous documents "did not specifically identify those as his reasons for firing" and equated performance with *financial* performance. *See Valentia Villetti, Faiza Jibril, M.D. v. Guidepoint Global LLC*, 2022 U.S. App. LEXIS 18651, *13 (2d Cir. July 7, 2022); *see, e.g.*, JX-3. Moreover, the documents evidencing non-financial performance issues that Cognizant cites (Mem. at 3) predated Franchitti's 2015 performance review, in which his non-financial performance "exceed[ed] most expectations." DX-32 at 15. It does not make sense that Cognizant would suddenly decide that these issues warranted termination halfway through 2016, absent retaliation, and the jury was right to reject that rationale as pretextual.

With regard to utilization, D+ utilization in Franchitti's unit was above the CBC average, DX-31, which the jury could have found would have been the more salient consideration for Cognizant, given its focus on margins, JX-2, and other D+ employees with no utilization were not similarly terminated. Tr. 120:12-121:11; *see Xu-Shen Zhou*, 4 F.Supp.at 418 (evidence that a "professor with lower teacher evaluation scores than [the p]laintiff" was treated more favorably

allowed jury to find explanation unworthy of credence).[3] The jury could also have found that Bala's scrutiny of expense reports was based on retaliatory animus, *see* p. 8, *supra*, and that the documents that Cognizant contends show a failure to "fully implement CBC programs" actually show a brief delay in completing administrative tasks that could not possibly have motivated a company to terminate an employee after *nine years*. *See* Mem. at 3 (citing DX-9; DX-14; DX-15).

## B. <u>Cognizant's Motion For a New Trial Should Be Denied.</u>

### 1. There was Sufficient Evidence of Protected Activity and Knowledge.

Cognizant argues that a new trial is warranted because Franchitti's testimony that he complained about race and national origin discrimination should not be credited over contrary testimony from Cognizant's witnesses. Mem. at 11-14. But where, as here, a "finding 'turned to a large extent on the credibility of the witnesses,'" it is "'particularly ill-suited to after-the-fact second guessing'" and a new trial is not warranted under Rule 59. *Kia*, 2015 U.S. Dist. LEXIS 123764, at *3-4 (quoting *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014)); *Wong v. Mangone*, 450 F. App'x 27, 31 (2d Cir. 2011) (argument that result was "seriously erroneous" where "jury relied exclusively on allegations made by [plaintiff] and his girlfriend and ignored evidence to the contrary by [defense] witnesses" was "without merit").

In the cases Cognizant cites, testimony on key issues conflicted with documentary evidence, or there was barely *any* evidence supporting the verdict, unlike here. *See Pierce v. City of N.Y.*, 805 F. App'x 70, 71 (2d Cir. 2020) (plaintiff's testimony "that his 'head was bashed into the road'" belied by a "hospital report detailing [the plaintiff's] injuries as minor cuts and bruises");

[3] While differential treatment of "similarly situated individuals" *can* be used to show pretext, *Summa v. Hofstra Univ.*, 708 F.3d 115, 130 (2d Cir. 2013), Franchitti was not, as Cognizant suggests, *required* to demonstrate this. *See Timbie v. Eli Lilly & Co.*, 2010 U.S. Dist. LEXIS 143434, at *23 (D. Conn. July 14, 2010) (discussing comparators in a disparate treatment—not retaliation—case).

*Finn-Verburg v. N.Y. State DOL*, 165 F.Supp.2d 223, 229 (N.D.N.Y. 2001) (where jury found hostile work environment, seriously erroneous to find that it was not gender-based, given lack of evidence that males were subjected to equally hostile environment); *Depascale v. Sylvania Elec. Prods.*, 510 F. App'x 77, 79 (2d Cir. 2013) (district court "combed the record" for testimony that would have allowed jury to reject government contractor defense and found little). Cognizant cites *Depascale* for the proposition that a "witness's conflicting testimony" is grounds for a new trial, Mem. at 12, but *DePascale* turned primarily on the lack of evidence of parallel commercial operations (which would have defeated the government contractor defense) where the scant testimony on that subject came from a witness that testified earlier in the same proceeding that "99.99% of the work performed [was] in connection with governmental contracts." *See Depascale*, 510 F. App'x at 81; *Depascale v. Sylvania Elec. Prods.*, 710 F.Supp.2d 275, 283, 285-86 (E.D.N.Y. 2010). Unlike in *DePascale*, *Finn-Verburg*, and *Pierce*, the jury heard ample evidence over multiple days of Franchitti's complaints (his testimony), none of Franchitti's testimony *supported* Cognizant's version of events, and the only contradictory evidence was the testimony of Cognizant's witnesses. To credit their testimony over Franchitti's would be a textbook example of improperly usurping the jury's credibility findings. *See Kia*, 2015 U.S. Dist. LEXIS 123764, at *3-4.

Even if it were appropriate to second-guess the jury's credibility findings, Cognizant's arguments fall short. Cognizant argues that Franchitti's testimony should not be believed because he put other complaints in writing, but not complaints about race and national origin discrimination. Mem. at 12. But it was apparent that Franchitti preferred to talk about sensitive topics "offline" or by phone. *See* PX-3, 8.

Cognizant attempts to call out discrepancies between Franchitti's trial testimony and his deposition testimony, interrogatory responses, and EEOC charge, Mem. at 13, but "this type of inconsistency is better addressed through cross-examination and impeachment of a witness, rather than in a post-trial motion." *Lopez v. Aramark Unif. & Career Apparel, Inc.*, 426 F.Supp.2d 914, 975 (N.D. Iowa 2006). Regardless, Cognizant flags only omissions or statements that are not actually inconsistent. For instance, while Cognizant claims that Franchitti's testimony that he complained to Livingston about the "visa letter process" contradicted his deposition testimony that he did not complain to Livingston "about signing the letters," Mem. at 13, there is a difference: Franchitti did not complain to Livingston about *having to sign* letters because Livingston never asked Franchitti to sign letters (Bala did), but, as Franchitti testified, he did complain to Livingston about the business model, including the use of manager letters. *See* §I.A., *supra*. Nor is Franchitti's testimony that he complained of "pure discrimination" inconsistent with interrogatory responses stating that he complained of, among other things, "discrimination." DX-66.

Likewise, Franchitti's testimony that Archemy was a "side project" after his termination is fully consistent with him having spent thousands of hours on Archemy *before joining Cognizant*. Tr. 191:21-23, 359:18-21, 363:19-364:4, 389:12-18. And Franchitti's testimony that he had to sell his personal car is perfectly consistent with owning antique cars that he presumably cannot drive around town. Tr. 366:4-14.

Cognizant also claims that Franchitti must have falsely testified that he sought medical treatment for emotional distress because that purpose was not reflected in his medical notes, but it is common sense that medical notes do not always contain every detail as to what prompted a visit. In any event, Franchitti's anxiety was well documented in other medical records introduced into evidence. PX-187. However, the jury did not award Franchitti emotional distress damages,

indicating that it found his testimony on that point insufficient. Dkts. 207, 208. That restraint demonstrates that the jury was thoughtful and fully capable of evaluating credibility piece-by-piece, and the Court should not overturn that evaluation. *Greenbaum v. Svenska Handelsbanken*, 67 F.Supp.2d 228, 273 (S.D.N.Y. 1999) (Sotomayor, J.) ("well-crafted verdict" that did not award everything asked for demonstrated that jury followed instructions).Cognizant also points to "consistent" testimony from its three fact witnesses that Franchitti did not complain about race or national origin discrimination. But Livingston did not "have a recollection as to what Franchitti was complaining about," Tr. 586:21-24, and Neveras did not remember what he spoke to Franchitti about following an April 3, 2016 email (PX-8), Tr. 700:12-701:1, when Franchitti testified that they discussed race and national origin discrimination.

Further, Cognizant's fact witnesses, particularly Bala, had their own credibility issues. Prior to being shown an email in which he referred to "pushing heavy weights" to the bench, PX-28, Bala testified that he never told Franchitti to "push heavyweights." Tr. 406:21-25. Bala also claimed that it was Franchitti who wanted to assign Chopra to a GTO project (rather than the bench), *id*. 506:24-507:1, despite having stated in an email that he (Bala) "wanted him to quietly move to GTO work for a couple of months" and "park him there." PX-3. Most concerningly, Bala insisted that Franchitti never complained to him about discrimination *at all*, Tr. 541:20-25, 543:11-12, 544:6-9, despite documentary evidence of Franchitti raising concerns to Bala about his stated preference for "younger" employees. *See* §I.A., *supra*. The jury was entitled to infer that Bala was similarly unforthcoming about Franchitti's race and national origin discrimination complaints.

Ultimately, "[t]he jury, as the finder of fact, [wa]s free to accept all, some, or none of any given witness' testimony." *Perry v. City of N.Y.*, 552 F.Supp.3d 433, 440 n.2 (S.D.N.Y. 2021).

And "it was the jury's prerogative to accept the bulk of the direct testimony submitted and to not find determinative any holes poked in that testimony on cross-examination." *Id*.

**2. The Court's Evidentiary Rulings Do Not Warrant a New Trial.**

Cognizant argues that a new trial is warranted because it disagrees with certain evidentiary rulings, but these arguments have largely been litigated, and "'Rule 59 is not a vehicle for relitigating old issues ... or otherwise taking a second bite at the apple.'" *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (quotation omitted).

First, Cognizant objects to the admission of Abigail Israel's testimony. Israel testified that she became aware of pay disparities impacting Cognizant's Indian national employees in the U.S., going back to at least 2013 or 2014 and continuing in 2020, and that when she voiced concerns about the disparities, managers in Compensation and Recruitment told her that Cognizant liked employing visa workers because they were "cheaper." Tr. 705:7-20, 706:1-20, 707:6-20, 708:20-24.[4] She further testified that leadership ignored her when she escalated concerns about the disparities, and that the company's VP of HR chastised her for raising the issues with a newly-hired CPO. *Id*. 708:14-709:9.

Cognizant argues that this testimony was irrelevant because it proved only the truth of the underlying discrimination, but Israel's testimony helped show why Cognizant would have been motivated to disregard Franchitti's complaints and get rid of him when they persisted, as fixing the underlying discrimination would have required Cognizant to upend its entire business model. *See id.* 707:6-20, JX-2. No such motive was present in the cases Cognizant cites. *See* Mem. at 16-17 (citing *Perez*, *Rumain*, *Orsaio*).

[4] Cognizant contends that Israel's testimony was not tied to CBC-GTO, Mem. at 16, but she testified to issues that applied across the board, inclusive of GTO, *see id*., JX-2, and to escalating issues to the top of the company. Tr. 708:14-709:9. Cognizant chose not to cross examine her on those points.

Cognizant argues that it was prejudiced because it "could not" investigate the subjects of Israel's testimony, which it admits were "the focus of ... a two week trial in *Palmer*," because the materials she relied on were not produced here. Mem. at 17. But the defendant here is Cognizant, not Morgan Lewis, and no Court order in this case has ever precluded *Cognizant* from accessing the materials it analyzed, in depth, in another case. Cognizant's failure to provide Morgan Lewis relevant materials from *Palmer* in advance of trial appears to have made Morgan Lewis's job more difficult, and seems inadvisable, but that decision has not prejudiced *Cognizant*.

Cognizant also argues that it was prejudiced by Franchitti's counsel referencing Israel's testimony in closing, but the majority of the transcript references Cognizant cites for this point merely reference Cognizant's "business model" and not Israel's testimony. *See* Tr. 819:13-820:2, 820:20-821:1, 821:10-14. It is not accurate, therefore, to say that Franchitti's "summation made [Israel's] testimony a centerpiece of his case." Mem. at 17. And the one portion of closing that did mention Israel's testimony properly referred to Cognizant's "motivation to make sure that [Cognizant's business] model stayed in place." Tr. 806:10-11.

Second, Cognizant argues that the Court should have allowed it to introduce evidence of prior lawsuits and allowed it to impeach Franchitti with a prior court's credibility finding for substantially the same reasons that have already been litigated and decided. *See* Dkt. 183 (MIL Order).

Even if considered, Cognizant does not demonstrate that the Court's prior decision was incorrect. Cognizant claims that Franchitti having brought prior litigation goes to motive, but it has described its theory of relevance as follows: "when faced with employment termination, he asserts that he is not to blame for his employment terminations and that the reasons must instead be unlawful." Dkt. 169 at 2. The Court correctly found that this theory of relevance "depend[s] on

propensity inferences that are prohibited by Rule 404(b)," and that any probative value was outweighed by unfair prejudice. Dkt. 183 at 1.

Cognizant argues that the *Bloomberg* court's credibility finding was admissible to impeach Franchitti, citing Rules 608(b) and 613(a). Mem. at 19. But Rule 613(a) pertains to a "Witness's Prior Statement," Fed. R. Evid. 613(a), and would not allow introduction of *Judge Kaplan's* statement about Franchitti. And even if the credibility finding could be introduced under Rule 608(b), that rule at most allows for *questioning* about the prior finding, and would not, as Cognizant claims, allow for *extrinsic evidence* (i.e., admission of Judge Kaplan's opinion). Fed. R. Evid. 608(b). Further, Rule 608(b) is subject to Rule 403's probative-prejudice balancing test. *Spencer v. Int'l Shoppes, Inc.*, 2013 U.S. Dist. LEXIS 25524, at *10-11 (E.D.N.Y. Feb. 25, 2013). The Court correctly found the evidence excludable under Rule 403 "given, among other things, the passage of time, the undue significance a jury would likely give to the evidence, and the need to avoid a distracting side show." Dkt. 183 at 2.

### C. <u>The Jury's Award of Backpay Should Stand.</u>

Cognizant argues that the Court should grant judgment as a matter of law, order a new trial, or order remittitur regarding backpay because Franchitti failed to mitigate damages and because the damages were based on guesswork. These arguments are without merit.

#### 1. The Jury Correctly Rejected Cognizant's Mitigation Affirmative Defense.

"'[W]hile it is the plaintiff's duty to mitigate, it is the defendant who has the evidentiary burden of demonstrating at trial that a plaintiff has failed to satisfy this duty.'" *Kuper*, 2003 U.S. Dist. LEXIS 2362, at *17-18 (quoting *Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir.1992)). "To meet this burden, the defendant must show that suitable work existed and the employee did not make reasonable efforts to obtain it." *Id.* at 18. The *Greenway* exception "holds that an employer 'is released from the duty to establish the availability of comparable employment if it can prove

that the employee made no reasonable efforts to seek such employment.'" *Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005) (quotation omitted).

"The wrongfully terminated employee's duty to mitigate is minimal." *Ramey v. Dist. 141, Int'l Assoc. of Machinists & Aerospace Workers*, 2010 U.S. Dist. LEXIS 94646, *10 (E.D.N.Y. Sept. 10, 2010). "Whether this burden is satisfied is a question for the jury," and should be upheld unless the findings were "product of sheer surmise or conjecture." *Kuper*, 2003 U.S. Dist. LEXIS 2362, at *18. "Judgment as a matter of law on an issue as to which the movant bears the burden of proof is 'rare.'" *Broadnax*, 415 F.3d at 270 (quotation omitted).

Franchitti testified that to find work he: posted his resume on Dice; worked with recruiters who, he understands, submitted his resume to many jobs; applied for jobs directly on company websites; has, through these methods, applied for hundreds of jobs since 2016; and attends conferences at which he networks by telling people that he is looking for work. Tr. 188:1-190:6. He testified that he does not have written confirmation of every job he was submitted for by recruiters, as many conversations took place by phone. *Id.* 188:14-24.

Cognizant faults Franchitti for not responding to every recruiter, or for expressing disinterest where he was overqualified or a position required relocation, Mem. at 21, but a diligent job search does not require Franchitti to entertain those positions. *See Habeeb Ahmad v. N.Y. Univ.*, 2025 U.S. Dist. LEXIS 213605, at *89-90 (S.D.N.Y. Oct. 29, 2025) (declining to disturb jury's backpay award where plaintiff turned down jobs that paid less and that would have required relocation).

Cognizant contends that a reasonable job search would have included formal job applications, but the "determination of reasonableness" is a "fact-based determination" that "turns on the circumstances of the individual plaintiffs in relation to the available job market." *Ramey*,

2010 U.S. Dist. LEXIS 94646, at *15, 22. Cognizant's own expert, Dr. Turner, testified that working with recruiters (rather than submitting direct applications) could be reasonable and "sufficient" "in a field where the vast majority of positions are filled by those." Tr. 757:19-21. He also testified that the "hidden job market," in which roles are not posted publicly is more important for those seeking complex roles (like Franchitti), and that maintaining relevancy is important to access that job market. Tr. 761:20-762:18. The jury could have found it reasonable for Franchitti, an executive-level candidate with decades of experience in Information Technology, to work with recruiters, network, and endeavor to maintain his presence in the industry by, e.g., developing a company and speaking at conferences rather than submitting formal applications. *See EEOC v. Kallir, Philips, Ross, Inc.*, 420 F.Supp.919, 925 (S.D.N.Y. 1976) (defendant failed to meet its burden to show that circulating her resume informally among professional contacts was an unreasonable job search technique for plaintiff, whose skills and training were limited to her specialized field of pharmaceutical advertising); *Ramey*, 2010 U.S. Dist. LEXIS 94646, at *18 (reasonable for plaintiffs not to seek any employment *at all* where "no one was going to hire people at their age, on the cusp of retirement, for employment comparable to that of which defendants had deprived them, and thus there were no jobs available for them").

Cognizant points to Franchitti's teaching positions, but Franchitti was able to maintain his professorship while working at Cognizant, so professorship is not a "changed career path." Mem. at 23. Nor was the jury required to find that other hobbies and professional interests precluded Franchitti from conducting a diligent job search. *Habeeb Ahmad*, 2025 U.S. Dist. LEXIS 213605, at *91 (jury not required to find failure to mitigate where plaintiff "pursued a master's degree" and was entitled to credit testimony that he "continu[ed] to conduct a reasonably diligent job search" while in school).

Dr. Turner testified that he would have expected Franchitti to have found a job in four to six months, but he also testified that he had *never* evaluated someone in Franchitti's position who had found a job in that time frame. Tr. 767:2-13. Dr. Turner also testified that the labor market was robust, but his analyses looked at data for a wide range of positions. *Id*. 762:19-764:7. The jury was entitled to find that Dr. Turner's analyses did not answer the question of whether jobs were available for a candidate like Franchitti. *Kuper*, 2003 U.S. Dist. LEXIS 2362, at *20 ("generalized evidence that the 'industry is doing well' is insufficient to meet the burden to show comparable work existed.").

**2. Franchitti's Awarded Damages Were Not Based on Guesswork.**

Cognizant argues that there is no reasonable basis for the backpay award because the evidence showed that Franchitti would eventually have been replaced by Siegel even absent retaliation, Mem. at 24, but the jury could reasonably have found that, absent retaliatory animus, Franchitti's name would not have been on the chopping block to fund Siegel's salary. *See* §III.A., *supra*.

Cognizant argues that the backpay award was not tied to Franchitti's compensation because he was awarded more than the amount that would be calculated from his annual salary of $355,000, but "'[a]n award of back pay ... should ordinarily consist of lost salary, including anticipated raises, and fringe benefits.'" *Bailey v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2023 U.S. Dist. LEXIS 218589, at *3 (N.D.N.Y. Dec. 8, 2023) (quoting *EEOC v. Joint Apprenticeship Comm.*, 186 F.3d 110, 124 (2d Cir. 1998)); *see also* Dkt. 204 at 60. The jury was instructed to "use sound discretion" and "draw[] reasonable inferences" in calculating damages, which it did. Dkt. 204 at 60.

The jury was told that Franchitti earned approximately $355,000 at Cognizant and was terminated *approximately* ten years before trial, Tr. 199:3-18, such that Franchitti's lost wages

were around $3,550,000. Franchitti also testified that he had $140,000 in unvested stock options when he was terminated, *id*. 197:16-20, which would have vested had he remained employed but were instead forfeit. Additionally, Franchitti testified that the approximate value of his Cognizant health insurance was $900 to $1000 a month, *id*. 197:11-13, which would have come to up to $120,000 over ten years. Any difference is a small fraction of the total that the jury could have arrived at by, for example, including a modest additional amount to account for salary increases, expected stock and options awards, inflation, and/or increased stock value. *Id*. 197:19-23, 200:8-11, 20-21; *see Schara v. Tlic Worldwide, Inc.*, 2023 U.S. Dist. LEXIS 25754, at *9 (D.R.I. Feb. 13, 2023) (upholding award of $237,500 in back pay where salary would have yielded $190,000 and "jury reasonably could have factored in at some minimal amount" to account for, e.g., salary increases); *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 727 (2d Cir. 1984) (no error for trial court to consider "effects of inflation" in determining a back pay award). Cognizant argues that there was no evidence of expected salary increases, but "the 'grant[ing] of an increase in wages or salary is a normal incident of the way of life in the industrial and commercial world.'" *Koyen v. Consol. Edison Co.*, 560 F.Supp. 1161, 1164 (S.D.N.Y. 1983) (quotation omitted); *see also United States v. English*, 521 F.2d 63, 74 n.13 (9th Cir. 1975) ("if jurors should be prohibited from applying their common knowledge of inflation in reaching a verdict, the party entitled to recovery could be grievously under-compensated").

Where, as here, any discrepancy is not "facially unreasonable," "it is not the Court's role to nitpick the jury's decision." *Schara*, 2023 U.S. Dist. LEXIS 25754, at *9 (unexplained 25% difference not facially unreasonable).

**D. <u>The Court Should Uphold the Jury's Award of Punitive Damages.</u>**

**1. The Court Should Not Grant Judgment as a Matter of Law or Order a New Trial.**

Cognizant argues that judgment as a matter of law as to Franchitti's entitlement to punitive damages is warranted under Rule 50(b), but Cognizant waived this argument by failing to raise it in its Rule 50(a) motion. *Tolbert*, 242 F.3d at 76-77 (declining to address defendants' challenge as to the sufficiency of the evidence of punitive damages after concluding that it was not raised in defendants' Rule 50(a) motion at trial). Accordingly, the motion may be granted only if necessary to prevent "manifest injustice," which occurs where a verdict is wholly without legal support. *Kuper*, 2003 U.S. Dist. LEXIS 2362, at *10-11.

Cognizant cannot meet this burden. For a Title VII claim, punitive damages are available if a defendant intentionally discriminates "in the face of a perceived risk that these actions are prohibited by law." *Greenbaum*, 67 F.Supp.2d at 262. "Although a higher morally culpable state of mind is generally required for an award of punitive damages ... than for a finding of liability, much of the evidence used to support a finding of intent is also probative of reckless disregard of a plaintiff's rights." *Id.*

Here, Franchitti alleged that he complained about race and national origin discrimination for over a year, to multiple individuals. *See* §I.A., *supra*. These individuals denied the complaints, but testified that they understood such discrimination to be illegal and the importance of responding appropriately to discrimination concerns. Tr. 599:1-15; 699:10-18. Drawing all inferences in Franchitti's favor, this evidence gave the jury a basis to find Cognizant's reckless or callous indifference to Franchitti's federally protected rights. *See Champagne v. Columbia Dental, P.C.*, 2022 U.S. Dist. LEXIS 9190, at *22 (D. Conn. Jan. 19, 2022) (reckless disregard based on "ignoring of Plaintiff's complaints of sexual harassment to four different employees of Defendant, at least two of whom had supervisory responsibilities"); *Vasquez v. N.Y.C. Dep't of Educ.*, 2015

U.S. Dist. LEXIS 75321, at *27 (S.D.N.Y. June 10, 2015) (reckless disregard where jury could have inferred that school administrator knew gender discrimination was impermissible).

Cognizant argues that its lawsuit against Franchitti and Edward Cox could not have supported a punitive damages award because it post-dated Franchitti's termination and concerned Cognizant's conduct towards a non-party (Cox). Mem. at 25. But evidence is adequately related to harm where it is part of the same "course of conduct," *Fraser v. Wyeth, Inc.*, 992 F.Supp.2d 68, 87 (D. Conn. 2014),[5] and "[e]vidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible." *Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007). Evidence showing that even after being sued, Cognizant continued its efforts to silence challenges to its business model demonstrates a high degree of reprehensibility and need for deterrence. *See Greenbaum*, 67 F.Supp.2d at 270 (evidence that "pattern of discrimination may have extended to other female employees" showed higher degree of reprehensibility).

Cognizant argues that $4.2 million in punitive damages is so excessive that it could only have been awarded based on passion or prejudice, Mem. at 26-27, but the cases Cognizant cites are distinct because they involved high ratios of compensatory to punitive damages unlike the 1:1 ratio here. *Qorrolli v. Metro. Dental Assocs., D.D.S.*, 2022 U.S. Dist. LEXIS 226228, at *26 (S.D.N.Y. Dec. 15, 2022) (punitive damages 3.5x compensatory damages); *Tse v. UBS Fin. Servs., Inc.*, 568 F.Supp.2d 274, 314 (S.D.N.Y. 2008) (30:1 ratio). Cognizant also ignores the other factors warranting a high award, *see* §III.D.2., *infra*, including that higher amounts are necessary to deter

[5] *See also Watson v. E.S. Sutton, Inc.*, 2005 U.S. Dist. LEXIS 31578, at *51 (S.D.N.Y. Sep. 6, 2005) ("Punitive damages may be based not only on the actionable behavior, but on related misconduct, so long as it is closely relevant to the harm borne by the plaintiff").

the conduct of a wealthy defendant. *Vasquez*, 2015 U.S. Dist. LEXIS 75321, at *38 (assessment of excessiveness must take into account purpose of punitives, including deterrence).

Further, the "inflammatory" testimony Cognizant cites was five lines of testimony that Cognizant sued Cox and his widow. Tr. 184:13-17. Cognizant suggests that in so testifying, Franchitti "impl[ied]" that Cognizant "was responsible for two deaths," Mem. at 26, but Franchitti merely testified that Cox "passed away" and specifically stated that his widow's death was not caused by Cognizant. Tr. 184:15-17 ("And she died. Not because they sued her, but she eventually passed [a]way as well."). Even if this evidence was improper (it was not), it could hardly be said to have "comprised the core of the plaintiff's case." *Qorrolli*, 2022 U.S. Dist. LEXIS 226228, at *21. Cognizant also cites Israel's testimony, but her testimony similarly was neither improper nor the core of Franchitti's case. *See* §III.B.2., *supra*.

**2. The Court Should Not Grant a Remittitur Based on Due Process.**

As an initial matter, in arguing for a remittitur of punitive damages, Cognizant's *sole* argument is that the award violated due process. Mem. at 27-29 (asking Court to remit punitive damages "to a constitutionally permissible amount" and presenting factors relevant to "whether punitive damages are constitutionally excessive"). But the award is not constitutionally excessive and the *State Farm* factors do not weigh in favor of a reduction. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

With respect to the first factor, courts find a high degree of reprehensibility where "the misconduct continued over [a] prolonged period of time and was repeated, where complaints were routinely dismissed or not addressed, and/or [the] defendant acted with deceit." *Lewis v. Am. Sugar Refin., Inc.*, 325 F.Supp.3d 321, 368 (S.D.N.Y. 2018). Here, Franchitti testified that he complained to multiple decision-makers for over a year, and his complaints were routinely dismissed. *See* §I.A., *supra*. Further, the jury could have found Bala's effort to sabotage Franchitti's performance

and Livingston's failed plans to dispose of Franchitti under a "restructuring" rationale deceitful. *Id.*; *see Greenbaum*, 67 F.Supp.2d at 270 (conduct reprehensible where defendant "tried to retaliate against [plaintiff] in a deceitful manner by moving her to a position that would later be phased out for seemingly extrinsic reasons").

Cognizant points to testimony from Livingston and Neveras that they would have responded appropriately to allegations of discrimination and taken them seriously, Tr. 598:23-599:15; 699:10-18, as evidence of Cognizant's "efforts to comply with antiretaliation law," Mem. at 28, but the jury apparently did not credit that testimony, and it was not required to.

As for the second factor, courts look at the ratio of punitive damages and the harm suffered (here, backpay). *Greenbaum*, 67 F.Supp.2d at 270. A one-to-one ratio is clearly not excessive. *Applestein v. Kleinhendler*, 2025 U.S. Dist. LEXIS 63397, at *15 (E.D.N.Y. Apr. 2, 2025) (1.34 ratio ($15 million in punitive and $11.2 million in compensatory damages) "well within the [acceptable] range").

The Court may also consider the wealth of the defendant "in evaluating the punitive to compensatory damage ratio" to "determin[e] the size of an award that will adequately deter the defendant from future wrongdoing." *Kuper*, 2003 U.S. Dist. LEXIS 2362, at *6-7, 26. Cognizant's revenue in 2025 was approximately $21 billion, Tr. 187:18-25, such that a high award would be necessary to deter its misconduct. *Greenbaum*, 67 F.Supp.2d at 272 (given defendant's wealth, court harbored "grave doubts as to whether the purposes of deterrence would be served adequately by an award that is much smaller than $ 1.25 million").

As for the third factor, in examining awards in similar cases, awards should not be compared in "absolute terms but must be compared by reference to the [*State Farm*] factors." *Id.* at 271. Cognizant's cases all involved high ratios of punitive damages to backpay or compensatory

damages awards, which is not the case here. *See Thomas v. iStar Fin., Inc.*, 508 F.Supp.2d 252, 263 (S.D.N.Y. 2007) (over 3:1); *MacMillan v. Millenium Broadway Hotel*, 873 F.Supp.2d 546, 568 (S.D.N.Y. 2012) (8:1); *Rowe v. Google LLC*, 2026 U.S. Dist. LEXIS 73890, at *47 (S.D.N.Y. Apr. 3, 2026) (more than 6.66x); *Guerrero v. Constellation Health Servs., LLC*, 2026 U.S. Dist. LEXIS 87783, at *35 (E.D.N.Y. Apr. 21, 2026) (over 12:1). A ratio of 1:1 is well below what courts allow in similar cases. *See, e.g.*, *Gutierrez v. Taxi Club Mgmt.*, 2018 U.S. Dist. LEXIS 106808, at *28-29 (E.D.N.Y. June 25, 2018) (finding 2:1 ratio reasonable and listing other employment-related decisions upholding same).

Moreover, none considered a defendant with annual revenues in the dozens of billions. *Greenbaum*, 67 F.Supp.2d at 272 (distinguishing cases with lower award where defendant's finances "qualifie[d] [defendant] for the very highest punitive damages awardable for conduct of its flagrancy"); *Kuper*, 2003 U.S. Dist. LEXIS 2362, at *6-7 (recognizing that in comparing awards to other cases, "the wealth of the defendant may be a factor"). In addition, "[a] district court also should not limit its comparison of awards to civil rights claims." *Kuper*, 2003 U.S. Dist. LEXIS 2362, at *6.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Cognizant's motion.

Dated: June 5, 2026

By: /s/Daniel Kotchen
Daniel A. Kotchen (*pro hac vice*)
Amanda Burns
KOTCHEN & LOW LLP
1918 New Hampshire Avenue NW
Washington, DC 20009
(202) 471-1995
(202) 280-1128 (Fax)
dkotchen@kotchen.com
aburns@kotchen.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by electronic service through the Clerk of the Court's CM/ECF filing system.

Dated: June 5, 2026

By: /s/Daniel Kotchen
Daniel Kotchen