UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEAN-CLAUDE FRANCHITTI,<br><br>Plaintiff,<br><br>-v-<br><br>COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION et al.,<br><br>Defendants. | 21-CV-2174 (JMF)<br><br><u>OPINION AND ORDER</u> |

JESSE M. FURMAN, United States District Judge:

In this case, Plaintiff Jean-Claude Franchitti ("Dr. Franchitti") alleges that his former employers, Defendants Cognizant Technology Solutions Corporation and Cognizant Technology Solutions U.S. Corporation (together, "Cognizant"), fired him for complaining about race or national origin discrimination in the workplace. He brings retaliation claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* as well as the New York State Human Rights Law ("NYSHRL"), N.Y. EXEC. LAW § 296 *et seq*. On March 30, 2026, after five days of trial, a jury rendered a verdict in Dr. Franchitti's favor. Cognizant now moves, pursuant to Rules 50(b) and 59(a) of the Federal Rules of Civil Procedure, for judgment as a matter of law or, in the alternative, either a new trial on all issues or remittitur of the damages award.

For the reasons that follow, the Court denies Cognizant's Rule 50 motion for judgment as a matter of law but grants its Rule 59 motion for a new trial. As the Court will explain, the key distinction between the two motions lies in the degree of deference the Court must pay to the jury's verdict. In ruling on a Rule 50 motion, a court must view the evidence in the light most favorable to the non-moving party and defer to the jury's credibility assessments. Moreover, it

may grant the motion only if there is a complete absence of evidence supporting the verdict or the contrary evidence is so overwhelming that a reasonable jury could not have reached the verdict it did. By contrast, in ruling on a Rule 59 motion, a court may weigh the evidence and credibility of witnesses and need not view the evidence in the light most favorable to the non-moving party. Additionally, it may grant a new trial if it is convinced that the jury reached a seriously erroneous result or the verdict was a miscarriage of justice, and that is the case even if there is substantial evidence supporting the jury's verdict.

Applying those standards here, the Court is compelled to deny Cognizant's Rule 50 motion for judgment as a matter of law. Put simply, if the jury credited Dr. Franchitti's testimony — and, with respect to the Rule 50 motion, the Court must assume that it did — it could have found in Dr. Franchitti's favor. But the Court need not and does not defer to the jury's assessment of Dr. Franchitti's credibility in ruling on Cognizant's Rule 59 motion. In brief, given his utter lack of credibility, the complete absence of any contemporaneous evidence supporting his version of events, and the compelling evidence supporting Cognizant's account, the Court concludes that it would be a miscarriage of justice to let the verdict stand. Thus, and for the reasons that follow, the Court grants Cognizant's motion for a new trial.

## BACKGROUND

The following summary sets forth the facts, drawn from the evidence presented at trial, "necessary to contextualize the rulings on the parties' post-verdict motions." *Rowe v. Google LLC*, No. 19-CV-8655 (JHR), 2026 WL 915224, at *1 (S.D.N.Y. Apr. 3, 2026) (internal quotation marks omitted).

In April 2007, Cognizant hired Dr. Franchitti as a Director and Chief Architect. *See* Trial Tr. 62-63. In 2011, he was promoted to Assistant Vice President and later joined Cognizant's

Global Technology Office ("GTO"). *See id.* at 63-64, 393. In the middle of 2014, GTO became part of Cognizant Business Consulting ("CBC"), and Dr. Franchitti began to run CBC-GTO. *See id.* at 66-67. In that capacity, he reported to Raj Bala, the Chief Technology Officer, and Mark Livingston, the Head of CBC and an Executive Vice President ("EVP"). *See id.* at 68-69, 393, 477, 549. Dr. Franchitti's role was to "identify projects with customers," "help customers with strategy," and "provide resources to fill in these projects." *Id*. at 67.

At trial, the jury heard and saw evidence that, through 2014, Dr. Franchitti was doing relatively well at Cognizant, receiving a generally positive performance review in 2014, *see* DX-11, and a nomination for a promotion in early January 2015, *see* Trial Tr. 410. In 2015, however, Dr. Franchitti's relationships became increasingly conflict-ridden and his performance suffered. On Dr. Franchitti's version of events, beginning in 2014, Bala began to make comments to the effect that "Americans are worthless," that "Indians are superior when [it] comes to . . . technology," and that "we should get rid of" what he referred to as "heavyweights," "which were [W]esterners." *See id*. at 102-03. Dr. Franchitti testified that he began to complain that those comments were discriminatory. *See id*. at 103-04. It was then that, heading into 2015, the company set new financial goals, emphasizing "[m]argin growth" as "non-negotiable," JX-2, at 2, and, according to Dr. Franchitti, began ramping up their use of "less expensive" Indian national visa workers in lieu of "American employees" to "increase [those] margins," *see* Trial Tr. 85-87, 94, 101-02; *see also* JX-2 (directing CBC leaders to "crank[] up [m]argins" in part by "work[ing] to strengthen our offshore teams" and "get them travel ready"). Dr. Franchitti testified that he continued to complain that Bala's comments as well as Cognizant's so-called "visa readiness" strategy — specifically, the letters he was asked to sign in support of such applications — were "pure discrimination." *See* Trial Tr. 84, 90-92, 109.

According to Dr. Franchitti, it was all downhill from there. In early 2015, Bala "started nitpicking the reports and refusing to pay them." *Id.* at 112. When it came time to provide feedback for Dr. Franchitti's promotion in February, Bala's comments were lukewarm, PX-70, at 6-7 — despite the fact that some clients had stated that Dr. Franchitti "walk[ed] on water," and that other employees could not "hold a candle" to him, *id.* at 2, 7 — and Dr. Franchitti was not promoted, *see* Trial Tr. 117; *see also* PX-1, at 2. Bala also started "undercutting" CBC-GTO, taking Dr. Franchitti's customers to a unit Bala had formed called GTO Labs and making it "difficult" for Dr. Franchitti to "sustain [his] numbers." Trial Tr. 112-13. Dr. Franchitti testified that he raised many of these issues — as well as his claims of race and national-origin discrimination — with GTO Human Resources ("HR") staff abroad. *See id.* at 150-51. Per Dr. Franchitti, his relationship with Livingston soon followed a similar pattern. In mid-2015, he raised concerns with Livingston about Bala's comments, Bala's actions that impeded Franchitti's success, and Cognizant's allegedly discriminatory business model. *See id.* at 113-15. After that, Livingston "stopped meeting with [Dr. Franchitti] on a regular basis," and "ma[de] negative remarks more than positive ones, trying to blame [Dr. Franchitti] for one thing or another." *Id.* at 115. But Dr. Franchitti testified that he continued to protest, *see id.* at 104-09 (discussing the November and December 2015 emails at PX-28 and PX-32), telling Bala that his efforts to protect Indian employees while instructing Franchitti to "offload heavyweights" were "pure discrimination," *id.* at 109; *see also* PX-28, at 1 (Bala stating in a December 2015 email "[h]ow smartly they are pushing heavyweights . . . we just got rid of 4D+ and we don't need more heavyweights").

Cognizant's version of events in 2015 was, needless to say, quite different. Bala, Livingston, and Cognizant's former CBC Chief People Officer, Neil Neveras, all testified that

Dr. Franchitti never once complained of race or national-origin discrimination, *see* Trial Tr. 440, 544, 598-99, 699 — although Livingston also stated that he did not fully recall all of Dr. Franchitti's complaints, *see id.* at 586-87. Instead, per Cognizant, Dr. Franchitti's relationships became strained and his job imperiled because of his poor financial performance, failure to take accountability, and increasing hostility. Cognizant presented evidence, for example, that, throughout 2015, Livingston repeatedly warned Dr. Franchitti that he was off track and needed to fix it. *See, e.g.*, DX-11 through 13. By October 2015, Livingston emailed Franchitti and his offshore counterpart stating that Dr. Franchitti's practice profitability was "dismal and frankly one of the worst in CBC," despite having "discussed this many times." DX-20, at 1. A few months later, Dr. Franchitti himself admitted to missing certain financial targets in 2015. *See* JX-5, at 4. Cognizant also adduced proof that Dr. Franchitti fell short on several aspects of his non-financial performance, including failing to meet deadlines, *e.g.*, DX-9; DX-14, ignoring expense policies, *e.g.*, JX-13; PX-91; DX-18 through 19; DX-21, and billing client hours, *see, e.g.*, JX-14; Trial Tr. 262-65. In either case, by November 2015, Livingston — apparently acting on a decision made with Bala — suggested eliminating Dr. Franchitti's position to help finance the salary of a prospective hire, Seth Siegel, as part of Cognizant's efforts to expand its technology consulting. *See* DX-24, at 2-3; *see also* PX-83; Trial Tr. 451 (Bala confirming that he was "looking to replace Dr. Franchitti at this point"); 629 (Livingston stating that "we'd made a decision" to "move [Franchitti] out of [his] role" and that he was "proposing how we would pay for . . . and justify" Seth Siegel's compensation). While the restructuring was delayed, Seigel joined as a contractor to learn the business. *See* Trial Tr. 632. Meanwhile, Dr. Franchitti received a harsher performance review for 2015. *See* DX-32, at 26.

Things came to a head in 2016. According to Dr. Franchitti's testimony, he continued complaining to Bala about discrimination, including "several times" in February 2016. *See* Trial Tr. 151. And per the documentary evidence, he and Bala continued to exchange increasingly hostile emails in the early months of the year, in part because Dr. Franchitti disagreed with Bala's decision to nominate one of Dr. Franchitti's subordinates, Alan Inglis, for a promotion. *See, e.g.*, JX-5 (Dr. Franchitti stating, "I cannot entertain further discussion" to Bala); JX-7, at 1 (Bala responding to Dr. Franchitti's reservations about Inglis in early April: "When did Phil become your boss"?). On April 1, 2016, Bala circulated an email announcing certain "organizational changes . . . effected with the aim of motivating younger talent . . . to take up higher responsibilities." PX-3, at 3. The next day, Dr. Franchitti wrote to Bala separately stating, among other things, that members of the team had "expressed concerns about the terminology" of his email and the "concerning" aims of the organizational changes it announced. PX-3, at 2. He asked to "discuss [that] part offline." *Id.*; *see also* PX-8 (raising issue with the head of CBC HR via email on April 3, 2016). A few days later, per Dr. Franchitti's testimony, he escalated his concerns of race and national-origin discrimination to CBC HR, including to Neveras, as well as to EVP Allen Shaheen, *see id.* at 155-60; *see also* PX-4 through 5, PX-7 through 8. Tensions continued to flare between Dr. Franchitti and Bala over the Inglis promotion, *see, e.g.*, DX-36; PX-71, until, on May 4, 2016, Bala emailed Livingston about "[t]he pain [Dr. Franchitti wa]s causing," asserting, among other things, that "US revenue on CBC [had] not increased," and that "he is always blaming something or some[o]ne for everything," and ultimately asking, "[s]hould we release him?" DX-38, at 1. After that, Livingston looped in Neveras, *id.*, and Neveras jumped into gear, seeking certain performance evaluations — Key

Result Areas or KRAs — and "documentation of [Dr. Franchitti] missing targets," PX-76; *see* Trial Tr. 115, 265, 658.

With conflicts apparently continuing, *see, e.g.*, DX-40 (Neveras noting in a June 27, 2016 email that Dr. Franchitti "blew up at [him] over a direct and objective piece of feedback"), on June 27, 2016, Neveras informed Legal that Cognizant "need[ed] to terminate [Dr. Franchitti] for poor performance"; that he was "gathering" the "[g]rounds"; and that Dr. Franchitti "ha[d] been underperforming for about two years, and [they] ha[d] good documentation as such," PX-47. Bala relayed to Neveras, however, that Dr. Franchitti's "last three months [of] data ha[d] been very much in line with [their] expectations and hence not leading to [a] recent performance [problem]." JX-3. And, in fact, Dr. Franchitti adduced some evidence that, by June 2016, CBC-GTO was performing well across the board compared to the other GTO sub-units. *See* PX-57, at 6-7; *see also* Trial Tr. 64-65, 550 (explaining Cognizant's structure). Contemporaneous emails also suggest that Bala proposed moving Dr. Franchitti to the "Cognizant Deployment Pool" ("CDP") — a sort of "bench" where employees who are underperforming or unassigned await reassignment, *see* ECF No. 1, at 11; Trial Tr. 71, 102, 674-76 — instead of termination, *see* JX-3. But in the end, on July 19, 2016, Livingston terminated Dr. Franchitti's employment. Trial Tr. 165-67. That same day, Dr. Franchitti emailed another Cognizant employee indicating that he had been fired, "obviously in retaliation for reporting race and related age discrimination." PX-25.

On March 12, 2021, Dr. Franchitti filed suit against Cognizant, *see* ECF No. 2, alleging that he was terminated in retaliation for complaining of race and/or national-origin discrimination in violation of Title VII and the NYSHRL and other claims, *see* ECF No. 46, ¶¶ 65-69, 77-81. After the Court dismissed all other claims for failure to state a claim, *see*

*Franchitti v. Cognizant Tech. Sols. Corp.*, No. 21-CV-2174 (JMF), 2022 WL 2657171, at *1 (S.D.N.Y. July 8, 2022), trial on the termination-based retaliation claims commenced on March 23, 2026, and lasted five days, *see* ECF No. 182. At the close of trial, Cognizant made a motion under Rule 50(a) for judgment as a matter of law, which the Court denied. *See* Trial Tr. 777-80. On March 30, 2026, the jury found in favor of Dr. Franchitti on both claims, awarding him $4.2 million in backpay and $4.2 million in punitive damages. *See* ECF Nos. 207-08.

## DISCUSSION

As noted, Cognizant now moves, pursuant to Rules 50(b) and 59(a), for judgment as a matter of law or, in the alternative, for a new trial on all issues or remittitur of damages. The Court will begin with the motion for judgment as a matter of law pursuant to Rule 50.

### A. Motion for Judgment as a Matter of Law

Rule 50 of the Federal Rules of Civil Procedure "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Cash v. Cnty. of Erie,* 654 F.3d 324, 333 (2d Cir. 2011) (quoting FED. R. CIV. P. 50(a)(1)). The burden is "particularly heavy . . . where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 800 (2d Cir. 2023) (internal quotation marks omitted). In such circumstances, a court may set aside the verdict only if, viewing the evidence in the light most favorable to the non-movant, "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not

arrive at a verdict against it." *Cash*, 654 F.3d at 333 (internal quotation marks omitted); *see also, e.g., Zellner v. Summerlin,* 494 F.3d 344, 371 (2d Cir. 2007) (stating that a Rule 50 motion may be granted only if the court concludes that "a reasonable juror would have been *compelled* to accept the view of the moving party" (internal quotation mark omitted) (emphasis in original)). Significantly, in making this assessment, "[t]he court . . . may not make credibility determinations or weigh the evidence." *Palin v. N.Y. Times Co.*, 113 F.4th 245, 263 (2d Cir. 2024) (internal quotation marks omitted).

Applying these standards here, the Court is compelled to deny Cognizant's motion for judgment as a matter of law. Cognizant argues that the jury lacked sufficient evidence to find that Dr. Franchitti's termination was caused by any protected activity. *See* ECF No. 218 ("Defs.' Mem."), at 6-11; ECF No. 224 ("Defs.' Reply"), at 3-4. But if the jury credited Dr. Franchitti's testimony — and, with respect to Cognizant's Rule 50 motion, the Court must assume that it did — it could indeed have found that Dr. Franchitti's termination was the "culminat[ion]" of a "campaign of retaliation" that began in early 2015. *See Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 255 (2d Cir. 2024). In brief, Dr. Franchitti testified that he complained of race or national-origin discrimination in 2014 and 2015, after which his relationships with Bala and Livingston quickly soured, *see, e.g.*, Trial Tr. 103-15, 225-26, and his job ended up on the chopping block amidst Cognizant's restructuring efforts, *see* Trial Tr. 115, 451, 627-32; *see also* PX-83; DX-24; PX-84. And although Dr. Franchitti was not let go in 2015, he ended the year with a harsher performance review than the year before, *compare* DX-11, at 12, 18-19, *with* DX-32, at 6, 25-26, for what he testified was effectively the same work, *see* Trial Tr. 67. As Cognizant contends, *see, e.g.*, Defs.' Reply 3, the fact that Bala nominated Dr. Franchitti for a promotion in January 2015, *see* Trial Tr. 410 — that is, *after* he allegedly began to complain in

2014 — arguably "breaks the chain of causation necessary to sustain [his] retaliation claim," *Van Brunt-Piehler v. Absolute Software, Inc.*, 744 F. Supp. 3d 277, 308 (W.D.N.Y. 2024) (internal quotation marks omitted). But a reasonable jury could have concluded that Bala's attitude toward Dr. Franchitti started to shift in 2015 because he kept complaining that the very practices the company was ramping up were racially discriminatory. *See* JX-2; Trial Tr. 101-02, 403-04, 579-80, 585-86. Further, as Cognizant argues, *see* Defs.' Reply 3-4, some of the 2015 emails in evidence suggest that the restructuring in Cognizant's technology consulting business was in the works as early as fall 2014, *see* DX-24; PX-84 — that is, *before* most, if not all, of Dr. Franchitti's complaints — which would likewise undermine any inference of retaliatory intent. But based on the emails, as well as Livingston's testimony, *see* Trial Tr. 629-30, the jury was entitled to conclude that the decision to eliminate Dr. Franchitti's position and use his salary to fund Siegel's was taken in the fall of 2015, even if Cognizant's restructuring plans had been set in motion the year before.

Moving into late 2015 and early 2016, the jury heard evidence that allowed it to conclude that, as Dr. Franchitti continued to complain to Bala during this period, *see, e.g.*, Trial Tr. 109, 151, their relationship became untenable. And then, within a month of Dr. Franchitti sounding the alarm to the head of CBC Human Resources (Neveras) and a trusted EVP (Shaheen), *see id.* at 155-57, PX-4 through 5; PX-7 through 8, Bala and Livingston recommended Dr. Franchitti's termination, *see* DX-38, PX-76, Neveras began gathering the grounds, *see* PX-47, and Dr. Franchitti was fired. *See also, e.g.*, *Golden v. Syracuse Reg'l Airport Auth.*, No. 23-1311, 2024 WL 4116427, at *3 (2d Cir. Sept. 9, 2024) (noting that "temporal proximity of five months or less supports the causation necessary for a prima facie claim of retaliation"). Here, it bears noting that the jury was not required to interpret Bala's suggestions that Dr. Franchitti be placed

on CDP as opposed to fired outright, *see* JX-3, as any less retaliatory than termination, since there is also evidence from which it could have concluded that moving Dr. Franchitti to the "bench" would have effectively guaranteed his termination, *see* Trial. Tr. 107, 177-78, 464. Thus, taken together, this sequence of events — involving escalating adverse treatment not long after Dr. Franchitti's complaints — is enough to support an inference that Dr. Franchitti would not have been fired but for his alleged complaints of race and national-origin discrimination.

On top of that, the jury could have found that "weaknesses, implausibilities, inconsistencies, or contradictions" in Cognizant's purported business justifications for firing Dr. Franchitti support the conclusion that "retaliation was a but-for cause" of his termination and that "the explanations were a pretext for a prohibited reason." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). For one, Dr. Franchitti testified that Livingston and Neveras informed him that he was "not" being terminated for "performance reasons" but due to Cognizant's restructuring efforts. *See* Tr. 166-67. But Cognizant's own internal contemporaneous efforts to "justify" Dr. Franchitti's termination were based on performance issues (including behavioral ones), not restructuring. *See* DX-38 (noting, among other things, certain financial performance issues and resistance to the Inglis nomination); JX-11 (referencing Dr. Franchitti's "poor leadership communication and performance"); PX-47, at 2 (referencing Dr. Franchitti's "poor performance"); PX-76 (gathering information regarding Dr. Franchitti's "KRAs for the last two years" as well as "any documentation of him missing targets"). Indeed, those documents do not mention any restructuring rationale. Nor do they reference most of the other non-financial performance issues on which Cognizant now relies. *See* Defs.' Mem. 3, 6 (citing Dr. Franchitti's alleged failures to implement CBC programs, comply with company

expenses policies, or bill client hours). The jury was entitled to find that these inconsistences signaled pretext.

The jury could also have found it implausible that Cognizant would have terminated Dr. Franchitti for financial performance in July 2016, when both trial testimony and documentary evidence supported a conclusion that his performance was "in line with . . . expectations" at that point. JX-3. Indeed, according to documentary evidence, by June 2016, CBC-GTO was the only one of the seven sub-units that met or exceeded targets for revenue, customer profit, and practice profitability for the month of June in 2016 and was one of only two sub-units that exceeded practice-profitability targets for the year to date. PX-57, at 6. CBC-GTO was behind target in only two categories: revenue and customer profit for the year to date. But so were the vast majority of the other sub-units, and CBC-GTO was only $100,000 behind the revenue target, a miniscule amount compared to other sub-units. *Id.*; Trial Tr. 127-28. Further, Livingston himself admitted at trial that Franchitti's financial performance was good at the time of his termination. *See* Trial Tr. 644. This evidence provides a reasonable basis for the jury to question Cognizant's financial-performance rationale.

Finally, although the record certainly contains evidence from which the jury could have found that Dr. Franchitti "became increasingly hostile, unprofessional, and confrontational" in 2016 (as discussed in more detail below with respect to Cognizant's Rule 59 motion), Defs.' Mem. 6; *see e.g.*, JX-5, at 1; JX-7, at 1; DX-36; DX-38, at 2, DX-40, the jury also saw evidence that, prior to the bulk of his complaints, Dr. Franchitti was viewed as polite, collaborative, and even, by Bala himself, "very quiet," *see* PX-70, at 5, 6, 8. And it saw evidence that Dr. Franchitti's relationships with Bala, Livingston, and Neveras deteriorated in the wake of his complaints, leading to, among other things, seemingly unprompted hostility even when he

calmly voiced disagreement at the outset of the Inglis promotion debacle. *See, e.g.*, JX-7 (Bala responding "When did Phil become your boss?"); Trial Tr. 152-54. Based on this evidence, the jury could have rejected Cognizant's claims that it fired Dr. Franchitti due to his admittedly unprofessional conduct and found instead that his relationships with Bala, Livingston, and Neveras became conflict-ridden because he had reported race and/or national-origin discrimination and that the "pain [he was] causing," DX-38, stemmed from these reports.

In sum, drawing all reasonable inferences in Dr. Franchitti's favor, given the sequence of events presented at trial and the gaps or tensions in Cognizant's reasons for firing Dr. Franchitti, the Court cannot conclude that the jury's finding of but-for causation was "the result of sheer surmise and conjecture." *Cash*, 654 F.3d at 333. Cognizant's Rule 50 motion to set aside the verdict on this ground therefore must be and is denied. *See Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 49 (2d Cir. 2025) (noting that the Second Circuit has "long cautioned against granting judgment as a matter of law where intent is at issue"); *cf., e.g.*, *Van Brunt-Piehler*, 744 F. Supp. 3d at 306-11 (granting the defendants' Rule 50 motion on but-for causation where the plaintiff was fired a year after her last alleged protected activity, "the evidence revealed that [the] [d]efendants contemplated [her] termination before her alleged protected activity," and the plaintiff had a favorable performance review following her alleged protected activity).

**B. Motion for a New Trial**

By contrast, Cognizant's Rule 59 motion for a new trial is on more solid ground. That is because of two "significant" differences between the standards governing a Rule 50 motion for judgment as a matter of law and the standards governing a Rule 59 motion for a new trial. *DLC Management Corp. v. Town of Hyde Park,* 163 F.3d 124, 134 (2d Cir. 1998). First, "[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence

supporting the jury's verdict." *Id.* Second, when deciding a Rule 59 motion, a district court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). To be sure, a district court must proceed with "with caution and great restraint," especially when asked to review a jury verdict based largely on witness credibility, and "may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Id.* (cleaned up); *accord ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 98-99 (2d Cir. 2014). But ultimately, a district court has discretion to grant a new trial if the district court "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 125 (2d Cir. 2024); *accord Raedle*, 670 F.3d at 418-19.

Cognizant's motion presents a close call, if only because the jury's verdict was plainly "based in part" on its assessment of witness credibility, but the Court ultimately concludes that a new trial is warranted because allowing the verdict to stand would result in a miscarriage of justice. *United States v. Landau*, 155 F.3d 93, 105 (2d Cir. 1998) (internal quotation marks omitted); *see id.* (observing that "deference" to a jury's credibility assessments does "not override the trial judge's duty to see that there is no miscarriage of justice. If convinced that there has been a miscarriage of justice then it is the trial judge's duty to set the verdict aside." (cleaned up)). For starters, it is accurate to say that Dr. Franchitti's case depended "entirely on his assertion that he made verbal complaints of race or national-origin discrimination." Defs.' Mem. 12. That assertion was credibly contradicted by Bala, Livingston, and Neveras. *See* Trial Tr. 440, 544, 598-99, 699. But even more significant, it was undermined by virtually all of the other evidence in the case. Taken together, "[t]he evidence against [Dr. Franchitti's] testimony

simply overwhelms the evidence in favor of a finding" that he engaged in protected activity, let alone that Cognizant terminated him on that basis. *Pierce v. City of New York*, 293 F. Supp. 3d 306, 316 (E.D.N.Y. 2017), *aff'd*, 805 F. App'x 70, 71 (2d Cir. 2020) (summary order).

First, there is no contemporaneous evidence supporting Dr. Franchitti's testimony that he complained about race or national-origin discrimination, let alone that Cognizant retaliated against him for doing so. The absence of such evidence is especially noteworthy for two reasons. For one, Dr. Franchitti claims that he complained of such discrimination a dozen or more times, to multiple Cognizant employees, over the course of some two years. *See* Tr. 103-04, 109, 113-15, 150-52, 155, 158-60, 225-26. For another, Dr. Franchitti was not shy about voicing, and documenting, complaints. Far from it: He complained, and documented his complaints, about virtually everything else under the sun, from financial targets,[1] to feedback,[2] to

---

[1] *See, e.g.*, DX-23, at 7 (claiming Livingston did not emphasize practice profitability until August 2015 when he and his counterpart were "completely robbed of our abilities to meet our targets"); *see also, e.g.*, DX-12, at 1-2 (Livingston alerting Dr. Franchitti in March 2015 that the "[b]iggest issue is the [practice profitability]," "[practice profitability] is the key target," "you cannot miss that number and must make the necessary adjustments").

[2] *See, e.g.*, JX-5, at 1 (stating to Bala that "2016 has nothing to do with 2015," and so "it is unfair of you to question my future abilities and/or character by making it sound like I would question numbers in the future," and asking "please do not tell me to 'move on' when you are the one making statements that everybody else involved in the team disagrees with"); PX-54, at 1 (asserting that Bala "is still stating that the revenue was not met which is incorrect according to the emails I gathered and inputs I received").

resources,[3] to promotions,[4] to the visa letters,[5] and perhaps most notably, to *other* forms of potential discrimination.[6] At times, he even emphasized creating a written record of his grievances. *See, e.g.*, JX-5, at 1 ("Please note that I am not trying to accomplish anything other than sticking to the truth and documenting it."); PX-72, at 2 ("I would appreciate if you could make a note of my objections as I intend to escalate this matter further."). By contrast, in the entire trial record, there is only one document suggesting that Dr. Franchitti ever made complaints about race or national-origin discrimination at Cognizant: an email that he sent to a colleague immediately *after* he was fired stating that he was "obviously" fired "in retaliation for reporting race and related age discrimination." PX-25. But that self-serving email — written when Dr. Franchitti may well have been planning this litigation — is a thin reed upon which to conclude that Dr. Franchitti's testimony about making complaints was credible.

Second, Dr. Franchitti's credibility was seriously undermined in a variety of ways at trial. For example, he claimed that in September 2015 he sought hospital treatment for emotional

---

3 *See, e.g.*, DX-34, at 5 ("In a nutshell, we are pressured by CBC targets and do not get the support expected from GTO to be successful. In fact it is all the opposite and we get roadblocks.").

4 *See, e.g.*, PX-72, at 1-2 (stating to human resources that "[f]or the record, I am not approving Alan[] [Inglis's] nomination for promotion" because "Alan's performance in 2015 was not up to spec," and later to Bala that "I will escalate this further and share the emails where you acknowledged that you 'promised' Alan a promotion"); JX-10, at 3 ("Please note that I care less about the final list but I do care about the fairness of the promotion process, which I believe is a concern of yours as well.").

5 *See, e.g.*, JX-1, at 4 ("Please let me know immediately who made this decision so I can raise my concerns with this approach.").

6 *See, e.g.*, PX-3, at 2-3 (noting to Bala that "[s]ome folks in the team [had] expressed concerns" about "the intents of the organizational change" aimed at "motivating younger talent" and that they "should probably discuss" the issue "offline"); PX-8 (asking to speak with Neveras while forwarding an email from a consulting director in CBC-GTO raising a complaint of age discrimination).

distress, yet the medical records from that visit reveal routine medical concerns and neck pain that Dr. Franchitti reportedly discovered "when he flipped around" while sleeping. *See* Trial Tr. 376-79; *see also* DX-65, at 7, 10, 27. Along similar lines, records from his generalist doctor indicated that he had not been seen between 2014 and 2019, PX-187, even though he testified that he had started seeing the doctor because of the alleged emotional distress "symptoms" that began in 2015, Trial Tr. 194-95, 379. Moreover, those records make no reference to emotional distress until 2021, five years after Dr. Franchitti was fired and after he initiated this lawsuit, *see* PX-187, at 6 (Sept. 2021), 13 (Oct. 2021), 19 (Nov. 2021). What's more, Dr. Franchitti's inconsistencies were not limited to his medical treatment. At trial, Dr. Franchitti referred to Archemy, a company that he had purportedly founded after leaving Cognizant, as "just a side project," Trial Tr. 191, 359, yet he swore under oath in other litigation that he had founded Archemy in 2006 and had devoted thousands of hours of intensive work to the company, *see id.* at 359-64. (In an effort to reconcile these statements, Dr. Franchitti said he developed the technology before joining Cognizant, *see* Trial Tr. 363-64, even though Archemy purports to be an artificial intelligence company that "leverage[s] the latest innovative technologies," JX-26, at 1, for which he recently obtained at least one patent, Trial Tr. 190, 343; JX-26, at 1, 6.) And while Dr. Franchitti claimed that he had to sell his car due to financial hardship, *see* Trial Tr. 196, he was forced to admit that he collects automobiles and is building an automobile museum, *see* Trial Tr. 366. Together, these contradictions render Dr. Franchitti's unsupported assertions about complaints of race and national origin discrimination "patently incredible." *Raedle*, 670 F.3d at 420 (internal quotation marks omitted).

Finally, a host of contemporaneous evidence undermines any inference that Dr. Franchitti would not have been fired but for any complaints of discrimination. Cognizant introduced

evidence, for example, that Dr. Franchitti failed to keep up with the company's 2015 financial goals, *see, e.g.*, DX-11 through 13; DX-20, at 1, including from Dr. Franchitti himself, *see* JX-5, at 4. Meanwhile, no evidence corroborates Dr. Franchitti's self-serving testimony that he underperformed because Bala "undercut[]" CBC-GTO, took his customers to GTO Labs, or otherwise made it "difficult" for him to "sustain [his] numbers." Trial Tr. 112-13. Additionally, there is evidence that Viswakumar Ramasubramanian, Dr. Franchitti's Indian counterpart offshore, Trial Tr. 88, received much of the same critical feedback from Livingston as Dr. Franchitti, *see e.g.*, DX-9; DX-13, at 2-4; DX-20, at 1; Trial Tr. 623-24, despite the fact that he did not complain of any discrimination. *Cf., e.g.*, *Timbie v. Eli Lilly & Co.*, 2010 WL 9067050, at *9 (D. Conn. July 14, 2010) ("That employees outside of the protected class were treated in the same way as Plaintiff works against an inference of discrimination."), *aff'd*, 429 F. App'x 20 (2d Cir. 2011) (summary order). There is also considerable force to Cognizant's argument, *see* Defs.' Mem. 8; Defs.' Reply 3 (internal quotation marks omitted), that "positive action[s]" between Dr. Franchitti's complaints and his termination — most notably, the fact that Bala worked with Dr. Franchitti on an improvement plan for 2016, *see, e.g.*, JX-5; Trial Tr. 301-06, 520-22, and the fact that, at some point before May 2016, Bala prevented Livingston from firing Dr. Franchitti, DX-38 — "[broke] the chain of causation necessary to sustain" his claims, *Van Brunt-Piehler*, 744 F. Supp. 3d at 308 (internal quotation marks omitted). Further, there is strong reason to believe that Dr. Franchitti's hostility and insubordination — most notably, with respect to the Inglis nomination — set off the chain of events that ultimately resulted in his termination.[7]

[7] *See, e.g.*, JX-5, at 1 (Dr. Franchitti stating, "I have somehow reached a point where I cannot entertain further discussion on this particular topic with you" to Bala); PX-3, at 1 (Dr. Franchitti protesting to Bala, in response to an internal email he circulated about CBC-GTO, that "[o]nce again, I wish we had spoken about this write up before it [was] published"); DX-36, at 1 (Dr. Franchitti responding to Bala, "[i]f I do not get an approval on the [promotion] list by the

Taken together, this evidence leads that Court to conclude that the jury reached a "seriously erroneous result." *Qorrolli*, 124 F.4th at 125. It is not only that Dr. Franchitti's testimony was directly, and credibly, rebutted by every other percipient witness. If that were all, this would be "a quintessential 'he said, [they] said' case," and the Court would likely be required to defer to the jury's determinations. *Ricciuti v. New York City Transit Auth.*, 70 F. Supp. 2d 300, 305 (S.D.N.Y. 1999). It is that there is virtually no evidence to corroborate what "he said," and a host of evidence to corroborate what "they said." In other words, "one conflicting account is so inherently implausible as to tax credulity," and "there is independent evidence in the trial record clearly demonstrating that to believe [Dr. Franchitti] over the other[ witnesses] would lead to a miscarriage of justice." *Id.* at 308. Under those circumstances, the Court is not required to defer to the jury's determination. To the contrary, it is the Court's "duty to set the verdict aside." *Landau*, 155 F.3d at 105 (cleaned up).[8]

**CONCLUSION**

For the foregoing reasons, the Court DENIES Cognizant's motion for judgment as a matter of law but GRANTS its motion for a new trial. In light of the grant of a new trial, the Court DENIES Dr. Franchitti's motions for attorneys' fees, costs, and prejudgment interest as moot. *See* ECF Nos. 209-10; *see also* ECF No. 222.

---

end of the day, I will need to escalate this matter"); PX-72, at 2 (in a heated email exchange, Dr. Franchitti referring to Bala's decision to nominate Inglis for a promotion as the product of "a 'buddy' system"); *see also, e.g.*, DX-38, at 1 (Bala discussing Dr. Franchitti's issues with the Inglis nomination in explaining "[t]he pain [Dr. Franchitti] is causing" and suggesting termination in May 2016); DX-40, at 1 (Neveras stating in a June 2016 email that Dr. Franchitti "blew up at [him] over a direct and objective piece of feedback" in connection with the promotion list).

[8] In light of that conclusion, the Court need not and does not reach Cognizant's arguments about instructional error and damages. *See* Defs.' Mem. 14-29.

Unless and until the Court orders otherwise, the parties shall submit a new proposed Joint Pretrial Order and associated materials (in accordance with Rule 26(a)(3) of the Federal Rules of Civil Procedure and Section 6 of the Court's Individual Rules and Practices in Civil Cases, available at https://www.nysd.uscourts.gov/hon-jesse-m-furman) **within thirty days of the date of this Opinion and Order**. The parties must be prepared for a retrial as soon **as two weeks thereafter**, but the Court will promptly schedule a trial date — or at least a conference to discuss a trial date — after reviewing the parties' submissions. That said, the Court is firmly of the view that the parties should try to settle this case without the need for a retrial. To that end, the Court directs the parties to confer immediately about the prospect of settlement, including participation in another settlement conference before Magistrate Judge Ricardo (or before a mediator appointed by the Court or retained privately). If the parties agree that a settlement conference would be worthwhile, they should promptly advise the Court and may seek an appropriate extension of the pretrial deadlines to focus on settlement.

The Clerk of Court is directed to terminate ECF Nos. 210 and 217.

SO ORDERED.

Dated: September 9, 2026
New York, New York

JESSE M. FURMAN
United States District Judge